## Case No. 13,621.

### The SUNNYSIDE.

[1 Brown, Adm. 415.] [1]

District Court, E. D. Michigan. May, 1872.

#### DEMURRAGE—DAMAGES—MASTER'S WAGES.

1. Where a tug injured by a collision was a member of an association, into which each boat was put at an appraised valuation, and each drew its pro rata share of the net earnings of the whole, according to its valuation, the dividends paid by the association during the time the tug was laid up for repairs were *held* to furnish a proper basis for demurrage.

2. Demurrage cannot be allowed for unnecessary or unexplained delays.

3. The salary and board of the master while superintending the repairs was also *held* a proper charge.

[Cited in The Alaska, 44 Fed. 500.]

4. When the contract for raising the tug was let at a specific sum, with the proviso that the contractor should have the use incidentally of any other tugs belonging to the association, the services of these tugs were *held* a proper item of damages.

On exceptions to the commissioner's report.

---

[1] [Reported by Hon. Henry B. Brown, District Judge, and here reprinted by permission.]

The bark Sunnyside was libelled by John Miner, owner of the tug Goodnow, for collision, and a cross-libel was filed against the Goodnow. Both vessels were held in fault, and a division of damages was decreed, and it was referred to a commissioner to ascertain the damages. [Case unreported.] The commissioner having made his report, the owner of the Sunnyside comes in and excepts to certain items allowed by the commissioner. In the following opinion only those exceptions are noticed which were insisted on at the hearing and in the briefs furnished.

F. H. Canfield and Geo. V. N. Lothrop, for exceptions.

H. B. Brown, contra.

LONGYEAR, District Judge. 1. As to the item for demurrage, three months at $1,500 per month, $4,500. The owner of the Goodnow was a member of an association called "The Detroit and St. Clair River Towing Association," composed of owners of towing-boats at the port of Detroit. Each boat was put in at an appraised valuation, and each drew its pro rata share of the net proceeds of the earnings of the whole, according to its valuation. The appraised valuation at which the Goodnow was put in was not shown before the commissioner, but it is now shown by a stipulation between proctors to have been $23,000. The evidence shows that for the navigation season of 1869, in which the collision occurred, the net proceeds were 11 per cent. upon the appraised valuation; and it is now agreed that these data constitute the correct basis of damages for demurrage, which agreement is in entire accord with the opinion of the court. It is also agreed that the season of navigation is comprised in the eight months commencing April 1st and ending November 30th; but advocates are not exactly agreed as to the length of time the Goodnow was necessarily detained on account of the collision. They differ, however, only one quarter of a month, respondents conceding two months, and libellant claiming two and one-quarter months. The collision occurred June 14th, 1869, and the repairs were completed and the Goodnow commenced running September 30th, 1869, as appears by the proofs. This comprises a period of three and one-half months. Damages for detention can be allowed only for such time as was necessary to raise the vessel and make the necessary repairs. Nothing can be charged for unnecessary or unexplained delays. This is conceded. John Miner, libellant, testified before the commissioner as follows: "I commenced raising her nearly three weeks after she sunk. There was a delay of nearly a month after she got to Detroit before she commenced repairing." These delays are not explained, and it is conceded that some deduction ought to be made on account of them. I think the deduction of one month and a half

claimed by respondents' advocates is little enough, and that an allowance for two months is liberal. The exception to the allowance for demurrage is, therefore, sustained in part, and a deduction from the amount allowed must be made as follows: Eleven per cent. on $23,000 is $2,530 for the season of eight months. This would give $632 50 for two months, as the correct allowance for demurrage. The deduction, therefore, to be made from the gross allowance made by the commissioner is $3,867 50.

2. As to the item for John Miner's board and wages, $345. The objection to this item is that it does not appear what he did, or that his services were necessary. Miner was master as well as owner of the Goodnow, and, of course, in his capacity of master, his time was worth whatever it would cost to hire a man in that capacity. The collision, of course, threw him out of employment, and, instead of engaging in other employment, it appears from his testimony that he actually worked during the time of the detention of the Goodnow in raising and repairing her. I think, under all the circumstances, he ought to be allowed for his time and board during the necessary detention of the vessel, which, as we have seen, was two months. The rates charged are $100 per month wages, and $15 per month for board. These rates were allowed by the commissioner, and I think correctly. In fact no objection is made on that account. But as the allowance was made by the commissioner for three months, the exception must be sustained in part, and a deduction of $115 must be made from the amount allowed by the commissioner for the one month's excessive allowance.

3. As to the items for use of the tug Park, at $900, Sweepstakes at $150, and Bob Anderson at $300. The raising of the Goodnow was let to one Ballentine for $2,500, and these tugs were used by him in that service. The objection to these items is that these tugs belonged to the association, and, having let the entire contract to Ballentine for a fixed sum, they must get their pay of him, or if they saw fit to donate the use of the tugs to him, they cannot charge the same to the respondents,—in other words, that all the respondents are liable for is the amount for which the contract was let.

The proof shows that these tugs belonged to the association. Ballentine, the contractor, testifies that he took the job of raising the Goodnow at $2,500, and was to have the services of the tug Park in addition; that he found the services of other tugs necessary, and employed the Sweepstakes and the Bob Anderson of the association; that the association, finding he had lost money, donated to him the services of the two last named tugs. This testimony settles the matter against the exception, and in favor of the allowance by the commissioner, so far as the tug Park is concerned. In regard to the

other two, Mr. Livingstone, the treasurer of the association, in his testimony, states the contract with Ballentine as follows: "A contract was made with J. M. Ballentine to raise her for $2,500, and deliver her at a dock in Detroit, with the understanding that he was to have the use of the tug T. F. Park, without charge or expense, and also that he was to have the use, incidentally, of any of the other tugs of the association which he might require, without charge or expense." And on his cross-examination he says: "The three tugs and the incidental help were furnished to Ballentine without charge on the part of the association. That was part and parcel of the contract." And this testimony is not in any manner contradicted, unless a contradiction may be inferred from Ballentine's testimony. But I do not think such mere inference sufficient to do away with Livingstone's positive statements. These allowances were, therefore, correct, and the exception to them is overruled. Ordered accordingly.

[NOTE. An appeal from the decree of the district court dividing the damages was taken to the circuit court, where both parties were again heard. The circuit court reversed the decree of the district court, and entered a decree for the libelant in the cross libel, and dismissed the bill in the suit instituted by the owner of the steam tug. Instead of holding that both vessels were in fault, the circuit court decided that the steam tug was wholly in fault (Case No. 13,620), and the libelant in the principal suit appealed to the supreme court. That court reversed the decree of the circuit court, and remanded the cause, with directions to enter a decree affirming the decree of the district court. 91 U. S. 208.]